UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Plaintiff,

NICHOLAS KALMAN,
v.

Defendants,

KEY FOREIGN MOTORS OF LEBANON, LLC,
d/b/a "KEY NISSAN OF LEBANON";

ANTHONY Di LORENZO, d/b/a/ "KEY AUTO GROUP";

KEY MOTORS OF RUTLAND, LLC, d/b/a
"KEY HONDA OF RUTLAND";

KEY MOTORS OF LEBANON, LLC, d/b/a
"KEY CHRYSLER DODGE JEEP RAM OF
LEBANON"

WHITE RIVER CHEVROLET, LLC, d/b/a
"KEY CHEVROLET OF WHITE RIVER"

KEY MOTORS OF SOUTH BURLINGTON, LLC d/b/a
"KEY CHEVROLET BUICK GMC CADILLAC OF
OF SOUTH BURLINGTON";

DILORENZO OPERATING ENTITY HOLDING CO.
OF 2020, LLC, d/b/a "KEY AUTO GROUP";

KEY AUTO, LLC; and

CICOTTE AUTOMOBILE COMPANY, LLC.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

JURY TRIAL REQUESTED

## **COMPLAINT**

## I.    INTRODUCTION

This is an FMLA and ADAAA matter.  The Plaintiff was a stellar automobile sales manager, steering his car dealership through the tumultuous economic time that was 2020.  The Plaintiff, a

1

former professional athlete, became shockingly and gravely ill, in the spring of 2020, with flu-like symptoms that progressed to serious liver disease and paralysis.  The Defendants callously terminated the Plaintiff on the day he was being discharged from inpatient medical treatment for his serious impairments.  The Defendants would go on to give three shifting and false reasons for the termination decision, with the last one being, absurdly, that the *Plaintiff* was responsible for sales losses that his dealership suffered in the onset of the pandemic.

## II.   PARTIES

1.      The Plaintiff, Nicholas Kalman [hereafter "Mr. Kalman"], resides in Exeter, New Hampshire.

2.      Defendant, Key Foreign Motors of Lebanon, LLC, d/b/a "Key Nissan of Lebanon" [hereafter "KFML"], is a New Hampshire limited liability company with a principal office address of 549 US Highway 1 Bypass, Portsmouth, NH.

3.      Defendant, Anthony DiLorenzo, resides in Portsmouth, New Hampshire.

4.      Defendant, Key Motors of Rutland, LLC, d/b/a "Key Honda of Rutland" [hereafter "KMR"], is incorporated in Vermont but maintains a principal office in New Hampshire, at 549 US Highway 1 Bypass, Portsmouth, to serve as either its headquarters or principal place of business.  Moreover, KMR's trade name information, as published on the Vermont Secretary of State website, states that KMR has "Citizenship/Domestic Jurisdiction" in "NH."

5.      Defendant, Key Motors of Lebanon, LLC, d/b/a "Key Chrysler Dodge Jeep Ram of Lebanon" [hereafter "KML"], is a New Hampshire limited liability company with a principal office address of 549 US Highway 1 Bypass, Portsmouth, NH.

6.      Defendant, White River Chevrolet, LLC, d/b/a "Key Chevrolet of White River" [hereafter "WRC"], is incorporated in Vermont but maintains a principal office in New Hampshire, at 549 US Highway 1 Bypass, Portsmouth, to serve as either its headquarters or principal place of business.

7.     Defendant, Key Motors of South Burlington, LLC, d/b/a "Key Chevrolet Buick GMC Cadillac of South Burlington" [hereafter "KMSB"], is a citizen of New Hampshire with a principal office address of 549 US Highway 1 Bypass, Portsmouth, NH.

8.     Defendant, Key Auto, LLC, is a New Hampshire limited liability company with a principal office address of 549 US Highway 1 Bypass, Portsmouth, NH.

9.     Defendant, DiLorenzo Operating Entity Holding Co. of 2020, LLC [hereafter "DiLorenzo Holding"], is a New Hampshire limited liability company with a principal office address of 127 Parrott Avenue, Portsmouth, NH.

10.    Defendant, Cicotte Automobile Company, LLC [hereafter "Cicotte"], is a New Hampshire limited liability company with a principal office address of 175 Heater Road, PO Box 600, Lebanon, NH.

## III.    JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction over Mr. Kalman's Americans With Disabilities Act Amendments Act ["ADAAA"] claims and Family Medical Leave Act ["FMLA"] claims pursuant to 28 U.S.C. § 1331, providing for district court original jurisdiction over civil actions arising from the laws of the United States.

12.    This Court has supplemental jurisdiction over Mr. Kalman's RSA 354-A claims under 28 U.S.C. § 1367.  The state law claims so relate to the ADAAA and FMLA claims that they form the same case or controversy.

13.    This Court has personal jurisdiction over all of the Defendants as they are either citizens of New Hampshire, incorporated in New Hampshire, or they maintain headquarters or principal places of business in New Hampshire.

14.    This Court is an appropriate venue for this cause of action pursuant to 28 U.S.C. § 1391(b)(2) because the Plaintiff's injuries occurred in New Hampshire.

IV.     **STATEMENT OF FACTS**

**Mr. Kalman was employed by KFML and "Key Auto Group."**

15.     Mr. Kalman was hired to be the Sales Manager at KFML on August 12, 2019.

16.     Mr. Kalman was previously employed at a dealership at 59 Evans Drive, Lebanon, NH which was acquired by KFML and/or "Key Auto Group" in August 2019.

17.     KFML is a New Hampshire limited liability company that operated a Nissan car dealership at 59 Evans Drive, Lebanon, NH.

18.     Mr. Kalman was paid by KFML, but he and his co-workers considered themselves to be employees of a larger organization, "Key Auto Group," a group of approximately 20 car/truck dealerships owned by Defendant, Mr. DiLorenzo.  Exhibit 1.

19.     The personnel materials that Mr. Kalman received in relation to his employment referred to him as a "Key Auto Group" employee, not a KFML employee.

20.     The terms and conditions of Mr. Kalman's employment were established and governed exclusively by policies in a "Key Auto Group" employee handbook.  Mr. Kalman never received any KFML-specific handbooks or policies.

21.     Significant to this case, Mr. Kalman's employment was subject to "Key Auto Group," not KFML, Family Medical Leave Act ["FMLA"] and Anti-Discrimination policies.  Exhibit 2.

22.     Other than his paychecks and tax forms, Mr. Kalman does not recall receiving any KMFL-specific materials that applied to his employment.

**There was so little separation between Mr. DiLorenzo, "Key Auto Group", Key Auto Group's Western New Hampshire/Vermont Region, other "Key Auto Group" dealerships operating within 75 miles of KFML, and KFML, that all of these effectively employed Mr. Kalman.**

23.     Most, but not all, of the dealerships within "Key Auto Group" are separately incorporated, including Defendants, KFML, KMR, WRC, KML and KMSB, which are all dealerships located in western New Hampshire and Vermont.

4

24.     "Key Auto Group" is not incorporated but is instead a trade name registered only to Mr. DiLorenzo as an individual.  Exhibit 3.  The "Key Auto Group" trade name is <u>not</u> registered to any corporation.

25.     Therefore, upon information and belief, Mr. DiLorenzo is the sole proprietor of an unincorporated business organization known as "Key Auto Group."

26.     After Mr. Kalman's termination, Mr. Kalman filed a charge of disability discrimination and retaliation against KFML, Exhibit 4, to which "Key Auto Group" Human Resources Director, Mubera Durakovic (n/k/a O'Brien) [hereafter "Ms. O'Brien"], submitted a verified response.

27.     Ms. O'Brien, of "Key Auto Group," responded to the charge on behalf of KFML.

28.     In the sworn response, Ms. O'Brien stated that KFML "is a part of Key Auto Group, which Anthony DiLorenzo is the owner of."

29.     Mr. Kalman later amended his charge, to clarify that Defendants Mr. DiLorenzo, Key Auto, LLC, and Cicottte Automobile Company, LLC were respondents to the charge.  Exhibit 5.

30.     Ms. O'Brien of "Key Auto Group" again submitted a verified response, to the amended charge, this time on behalf of KFML, Mr. DiLorenzo, <u>and</u> Key Auto, LLC.

31.     In her second sworn response, Ms. O'Brien amended her first sworn statement, as to Mr. DiLorenzo's ownership of "Key Auto Group," newly stating that Defendant, *DiLorenzo Holding* is the sole member of KFML and that DiLorenzo Holding is also the sole member of the other car/truck entities in "Key Auto Group."

32.     However, Defendant, *Key Auto, LLC*, is notably identified in New Hampshire Secretary of State filings as a manager-managed, limited liability <u>holding</u> company, for the management of companies and enterprises.  Exhibit 6.  Notably too, Mr. DiLorenzo is the sole identified manager of Key Auto, LLC.  <u>Id.</u>

33.     Based on the filing and the name *Key Auto*, LLC (bearing more than a passing similarity to "Key Auto Group"), Plaintiff believes Key Auto, LLC presently serves, or has served, as the holding company for KFML, KMR, WRC, KML and KMSB, as well as other car/truck entities within "Key Auto Group."

34.     Upon information and belief, Mr. DiLorenzo is the sole member of Key Auto, LLC, meaning there is little, if any, separation between Mr. DiLorenzo and Key Auto, LLC.

35.     Upon information and belief, Mr. DiLorenzo is the sole member of DiLorenzo Holding, meaning there is little, if any, separation between Mr. DiLorenzo and DiLorenzo Holding.

36.     Fellow "Key Auto Group" dealerships, KMR, KML, WRC, and KMSB, were all located within a 75-mile radius of Mr. Kalman's KFML worksite at 59 Evans Drive Lebanon, New Hampshire.

37.     Upon information and belief, at the time of Mr. Kalman's employment, KFML, KMR, KML, WRC, and KMSB were all in an identified Western New Hampshire/Vermont Region of "Key Auto Group."

38.     At the time of Mr. Kalman's employment, KFML, KMR, KML, WRC, and KMSB were all overseen and supervised by Brian Kenny [hereafter "Mr. Kenny"].

39.     Mr. Kenny held himself out to be General Manager of KMR and "Regional VP of Key Auto." Exhibit 7.

40.     Notably, Ms. O'Brien stated in her amended verified response that Mr. Kenny was employed by "Key Motors of South Burlington, LLC [KMSB]," apparently in *addition* to KMR, and that he also served as a "Regional VP," presumably for "Key Auto Group" and over its Western New Hampshire/Vermont Region of dealerships, including KFML.

41.     Mr. Kenny directed Mr. Kalman's work, and Mr. Kalman reported to, and was terminated by, Mr. Kenny.

42.     Mr. Kenny also directed and supervised KFML's General Manager at the time of Mr. Kalman's employment, Daniel Ambrose.

43.     "Key Auto Group" also employed Mr. Ambrose to serve as General Manager of KML.  In other words, Mr. Ambrose supervised both KFML and KML employees.

44.     In addition to KMR, KML, WRC, and KMSB being near Mr. Kalman's KFML worksite, other "Key Auto Group" dealerships were within a 75-mile radius of the worksite, including: Rasputin Trucking Company, LLC, d/b/a "Rochester Truck" [hereafter "RTC"]; Key Motors of Rochester, LLC, d/b/a "Key Chrysler Dodge Jeep Ram of Rochester" [hereafter "KMRCH"]; Somersworth Auto Center, Inc., d/b/a/ "Key Auto Center of Somersworth" [hereafter "KACS"]; "Key Buick GMC of Somersworth" [hereafter "KBGS"] - an entity <u>not</u> apparently incorporated but instead operating only under a trade name registered to Mr. DiLorenzo.  Exhibit 8.

**<u>Mr. Kalman's employers collectively employed greater than 50 employees.</u>**

45.     During Mr. Kalman's employment, KFML employed at least 26 employees.  Exhibit 4.

46.     During Mr. Kalman's employment, the Western New Hampshire/Vermont "Key Auto Group" Region overseen by Mr. Kenny, or KFML, KMR, KML, WRC, and KMSB, collectively employed more than 50 employees.

47.     Upon information and belief, KMR, KML, WRC, and KMSB each employed at least fifteen employees.

48.     During Mr. Kalman's employment, the Western New Hampshire/Vermont "Key Auto Group" dealerships along with the other "Key Auto Group" dealerships within a 75-mile radius of KFML (RTC, KMRCH, KACS, and KBGS) collectively employed well in excess of 50 employees.

49.     "Key Auto Group" advertises that it employs more than 1,000 employees. Exhibit 9.

**<u>Mr, Kalman's serious health condition, his disability, his request for medical leave as a disability accommodation, his taking medical leave, and his request for part-time work as a disability accommodation (after his leave), caused his termination.</u>**

50.     At the start of Mr. Kalman's employment, KFML did not have a general manager, and Mr. Kalman, as Sales Manager, was tasked with duties typically assigned to the general manager role.

51.     Mr. Kalman deftly performed these general management duties, such as recruiting and supervising dealership personnel, in addition to his marketing and sales duties.

52.     In the first two quarters of his employment, Mr. Kalman met reasonable sales expectations for KFML given his extra workload.

53.     Mr. Kenny complimented Mr. Kalman on his work performance in February 2020, just before Daniel Ambrose was hired, in March 2020, to serve as General Manager for both KFML and KML.

54.     At about this time, beginning in February 2020, Mr. Kalman became ill with extreme flu-like symptoms, including respiratory and gastrointestinal symptoms.

55.     While many of the flu-like symptoms dissipated after a few weeks, severe, persistent nausea and vomiting lingered for Mr. Kalman for approximately six months following the onset of his illness.

56.     Because Mr. Kalman was so dedicated to his work, he rarely took leave from work to deal with his vomiting symptoms.

57.     Consequently, Mr. Kalman's frequent need to vomit at work was visible and known to his co-workers and Mr. Ambrose.

58.     Ms. O'Brien, in amended verified response to Mr. Kalman's charge of discrimination, acknowledges that Mr. Ambrose was aware of Mr. Kalman's "stomach issues."

59.     During this approximate six-month period of persistent, daily vomiting, Mr. Kalman also found that he had to make frequent trips to the emergency room to treat his vomiting and dehydration, and he discussed these visits openly at work.

60.     In March 2020, the pandemic took hold and had a dramatic, negative impact on automobile sales nationally, and KMFL sales similarly dropped.

61.     In May of 2020, Mr. Kalman was admitted to the hospital for ascites, or an extreme swelling of the belly.  At this point, he underwent a series of tests for liver disease.

62.     In July of 2020, Mr. Kalman was officially diagnosed with fatty liver disease and cirrhosis of the liver, and he communicated the fact of these diagnoses to Mr. Ambrose and others at KFML.

63.     Mr. Ambrose and Mr. Kenny worked closely, and, upon information and belief, Mr. Kalman's liver diagnoses were relayed to Mr. Kenny.

64.     Ms. O'Brien admitted in amended verified response to Mr. Kalman's charge of discrimination that Mr. Kenny was "aware generally that Mr. Kalman had a[n] … unspecified medical issue and was undergoing some testing."

65.     Mr. Kenny, in fact, texted Mr. Ambrose on July 9, 2020, stating that he understood that Mr. Kalman "had medical issues" but that sales performance at KFML was unacceptable and that he would "not be able to keep [Mr. Kalman] on unless things start moving quickly."

66.     In so doing, Mr. Kenny ignored the influence of the pandemic on car sales at KFML and opted instead to attribute the drop in sales to Mr. Kalman's "medical issues."

67.     As a consequence of months of vomiting, by late July 2020, Mr. Kalman lost more than 100 pounds involuntarily.  The dramatic weight loss was obvious to all who saw Mr. Kalman at work, including his co-workers and Mr. Ambrose.

68.     Beginning in or around June of 2020, Mr. Kalman also began to suffer tingling, numbness, and weakness in his arms and legs.

69.     These symptoms became progressively worse such that by August 2020, Mr. Kalman could not walk more than a few steps at work without stopping to sit and rest, which was obvious to Mr. Kalman's co-workers and Mr. Ambrose.

70.     On Wednesday, August 19, 2020, Mr. Kalman awoke to find he was so weak he could not walk at all.

71.     Mr. Kalman immediately sought care at the Dartmouth-Hitchcock Medical Center emergency room and was admitted to the hospital for his paralysis that day.

72.     The following morning, on August 20, 2020, Mr. Kalman contacted Mr. Ambrose and communicated the fact of his paralysis and that he required hospitalization.

73.     Mr. Kalman further notified Mr. Ambrose that he would need the accommodation of leave from work to allow him to receive ongoing treatment for his paralysis.

74.     Mr. Ambrose responded to the effect that Mr. Kalman should not be concerned about work and that he should instead focus on his health needs.

75.     Neither Mr. Ambrose nor any Key Auto Group employee provided Mr. Kalman any notice of his FMLA rights, whatsoever.  Mr. Kalman remained unaware of any rights to FMLA leave up to and through the time of his termination.

76.     Later on August 20, 2020, Mr. Ambrose texted Mr. Kalman a question about a vehicle, indicating that he had spoken with Mr. Kenny about the vehicle, and also about Mr. Kalman's absence from work and the reasons for the absence.

77.     Ms. O'Brien admitted in her amended verified response that Mr. Ambrose informed Mr. Kenny that Mr. Kalman "had been admitted to DHMC last night and that they told him to expect to be there for a few days."

78.     In the hospital, Mr. Kalman was diagnosed with chronic neuropathy caused by malnutrition (due to months of vomiting).

79.     In the days that followed Mr. Kalman's admission, Mr. Kalman stayed in frequent contact with Mr. Ambrose and others at KFML.  In these conversations, Mr. Kalman disclosed his neuropathy and malnutrition diagnoses to Mr. Ambrose and to the finance and office managers at KFML.

80.     After a week of hospital admission, on August 26, 2020, Mr. Kalman was transferred to an inpatient rehabilitation center to receive occupational and physical therapies to improve his ambulation.

81.     Mr. Kalman communicated the fact of his transfer to Mr. Ambrose, who, upon information and belief, relayed this information, as well as information about Mr. Kalman's medical diagnoses, to Mr. Kenny.

82.     Sometime during the first week of September 2020, Mr. Kalman communicated to Mr. Ambrose that he expected to be discharged within a matter of days, and that he likely would be restricted to working part-time, after his discharge.

83.     Mr. Ambrose did not object to the request for part-time work and seemed generally open to a short-term, part-time schedule for Mr. Kalman.

84.     Upon information and belief, Mr. Ambrose relayed to Mr. Kenny the news of Mr. Kalman's imminent discharge and his need for a part-time schedule upon his return to work.

85.      On or about September 9, 2020, Mr. Kalman learned he would be discharged from the rehabilitation center on September 10, 2020.

86.     The morning of Thursday, September 10, 2020, Mr. Kenny called Mr. Kalman at the rehabilitation center.

87.     During this call, Mr. Kenny indicated his awareness of Mr. Kalman's serious health condition by asking Mr. Kalman how his treatment was progressing.

88.     Mr. Kalman briefly described his condition, diagnoses, and the treatment he received.

89.     Mr. Kalman further reported that treatment had worked to improve his condition, and that he would be discharged from rehabilitation that day.

90.     Mr. Kalman added that he was looking forward to returning to work the following Monday, September 14, 2020, albeit part-time and with crutches under doctors' orders.

11

91.    Mr. Kenny responded by telling Mr. Kalman that he was actually calling to terminate Mr. Kalman.

92.    Mr. Kenny went on to provide shifting bases for the termination decision, stating first with "we've decided to part ways" and second with "we are eliminating your position."

93.    Confused, Mr. Kalman asked what specifically prompted the termination decision.  However, Mr. Kenny refused to provide any substantive reasons.  Mr. Kenny would only reiterate that "Key Auto Group" had decided to "part" with Mr. Kalman.

94.    Mr. Kalman's position was not actually eliminated.  A new sales manager was hired at KFML within weeks of Mr. Kalman's termination.

95.    On September 11, 2020, Mr. Kalman was contacted by a "Key Auto Group" human resources representative, Michael Felber, who indicated that he had just learned of the termination and that he had not been consulted before the termination decision was made.

96.    Mr. Felber further suggested that he did not approve of the decision to terminate Mr. Kalman while he was out on medial leave, by only tersely advising Mr. Kalman of is health benefits ending and quickly ending the call.

97.    In her filings with the New Hampshire Commission for Human Rights, Ms. O'Brien, of "Key Auto Group," asserted in the first instance that Mr. Kalman was terminated for failing to meet monthly sales quotas in 2020.  The filings ignored the existence of the pandemic and its impact on automobile sales nationally.

98.    Despite Ms. O'Brien's representations of poor performance, Mr. Kalman's personnel file maintained by KFML and "Key Auto Group" is devoid of any documented performance concerns.

99.    Curiously too, though Mr. Kenny apparently harbored bias against Mr. Kalman's disability, secretly blaming pandemic-related losses on Mr. Kalman's "medical issues," neither he nor Mr. Ambrose ever actually *confronted* Mr. Kalman with any concerns over his performance at KFML.

100.    No Key Auto Group employee issued Mr. Kalman any warning that his employment was in jeopardy prior to his termination coming at the end of his medical leave.

**After Mr. Kalman's Charge of Discrimination and Retaliation was filed, Mr. DiLorenzo sold the assets of KFML to Cicotte, exposing Cicotte to liability for Mr. Kalman's claims.**

101.    Mr. Kalman filed his original charge of discrimination on or about March 4, 2021.  See Exh.

102.    The New Hampshire Commission for Human Rights notified KFML and its manager, Mr. DiLorenzo, of the charge filing on or about March 10, 2021.

103.    In or around May 2021, Mr. DiLorenzo negotiated sale of KFML's assets to Cicotte.  Exhibit 5, C.

104.    Upon information and belief, in the course of due diligence prior to purchasing KFML's assets, Cicotte learned of KFML's liabilities, including Mr. Kalman's pending discrimination and retaliation claims against KFML.

105.    Cicotte nevertheless proceeded with the asset purchase, and continued KFML's operations, by operating a Nissan car dealership at 59 Evans Drive, Lebanon, NH under the trade name "Nissan of Lebanon."  Id.

106.    If none of the "Key Auto Group" Defendants are capable of paying Mr. Kalman for his losses, Cicotte is liable as successor to KFML.  See Kratz v. Richard J. Boudreau & Assocs., LLC, 375 F. Supp. 3d 144, 150 (D.N.H. 2019)(reciting the federal common law test for successor liability for civil rights claims, including whether the asset seller is capable of providing relief to the claimant.)

**Mr. Kalman properly obtained a right to sue the defendants.**

107.    As alleged supra, Mr. Kalman amended his charge of discrimination to properly name Cicotte, Key Auto, LLC, and Mr. DiLorenzo as respondents to his administrative pleading.

108.    Though KMR, WRC, KML and KMSB were not expressly identified respondents in the amended charge, they were sufficiently placed on notice the administrative claims where: 1) Ms. O'Brien signed both verified responses, to Mr. Kalman's charge and his amended charge; and 2) Ms.

O'Brien is human resources director for all of "Key Auto Group," which includes, by her own admission, KMR, WRC, KML and KMSB.  See Ahanotu v. Massachusetts Tpk. Auth., 466 F. Supp. 2d 378, 391 (D. Mass. 2006)(holding that "The purpose behind requiring a charge to be filed with the EEOC is to provide the employer with prompt notice of the claim and to create an opportunity for early conciliation" and that therefore "the key factual issue … is whether [the not named respondents to the charge] received actual notice of the plaintiff's EEOC charge such that it had an opportunity for early conciliation.").

109.    In July 2022, well after Ms. O'Brien's amended verified response, Mr. Kalman properly removed his amended charge from the New Hampshire Commission for Human Rights and the EEOC.

110.    After this removal, on August 2, 2022, Mr. Kalman received the attached notice of right to sue affording him until November 2, 2022 to file this complaint and making this complaint timely filed. Exhibit 10.

**COUNT I – Violation of ADAAA 42 U.S.C. § 12112 (a) and RSA 354-:7, I**
**Discriminatory Discharge on the Basis of Disability**
***(against all Defendants)***

111.    The above and below paragraphs are incorporated by reference as if set forth fully herein.

112.    The Americans with Disabilities Act Amendments Act [hereafter "ADAAA"] provides that no covered employer, in deciding to discharge employees, shall discriminate against qualified individuals on the basis of disability.  42 U.S.C. § 12112 (a).   Put simply, the ADAAA prohibits terminating a qualified individual with a disability because of his disability.

113.    Similarly, New Hampshire RSA 354-A:7, I provides that it is an unlawful discriminatory practice for an employer to discharge from employment a qualified individual because of his physical disability.

114.     Case law interpretating the ADAAA applies to claims brought under New Hampshire RSA 354-A.  See e.g. Madeja v. MPB Corp., 149 N.H. 371, 379 (2003)(relying on Title VII case law to interpret RSA 354-A).

115.     To establish a prima facie case under the ADAAA, the plaintiff must prove by a preponderance of the evidence: (1) that he was disabled within the meaning of the ADAAA; (2) that he was able to perform the essential functions of his job, with or without reasonable accommodation; and (3) that the adverse employment decision was based in whole or in part on his disability.  Torres-Alman v. Verizon Wireless Puerto Rico, Inc., 522 F. Supp. 2d 367, 381 (D.P.R. 2007).

116.     Mr. Kalman was disabled within the meaning of the ADAAA where his liver disease and cirrhosis of the liver brought on vomiting, malnutrition, and neuropathy such that he was substantially limited in hepatic, digestive, and neurologic body functions as well as the major life activities of eating, standing, and walking.  See 29 C.F.R § 1630.2.

117.     The ADAAA includes in its "disability" definition being "regarded as" having a physical impairment that substantially limits a major life activity.  See 42 U.S.C. § 12102 (1)(C). The ADAAA also includes "working" as a "major life activity."  See 42 U.S.C. §12102 (2)(A).

118.     "Regarding" an employee as being disabled includes "a covered entity mistakenly believ[ing] that an actual, nonlimiting impairment substantially limits one or more major life activities."  Bailey v. Georgia-Pac. Corp., 306 F.3d 1162, 1169 (1st Cir. 2002).

119.     In Mr. Kalman's case, Mr. Kenny mistakenly believed that Mr. Kalman's liver impairment substantially limited him in the major life activity of working, where he discriminatorily attributed pandemic-related sales losses to Mr. Kalman's "medical issues."

120.     Mr. Kalman was able to perform the essential functions of his Sales Manager position with reasonable accommodation where Mr. Ambrose communicated that Mr. Kalman could reasonably take leave for his hospitalization and thereafter could reasonably work a part-time schedule.

121.    Mr. Kalman was terminated in whole or in part because of this disability where:

(a)    Mr. Kenny, documented in text his biased belief that Mr. Kalman's "medical" impairment, as opposed to the pandemic, was interfering with his ability to work and produce sales at KFML;

(b)    Mr. Kalman requested and availed of disability accommodation in the form of approximately three weeks of leave, which was reasonable (per Mr. Ambrose) but which Mr. Kenny was not inclined to provide;

(c)    Mr. Kalman additionally requested the accommodation of a part-time work schedule upon his return to work, which was reasonable (per Mr. Ambrose) and required to be provided ADAAA, but which Mr. Kenny was not inclined to provide;

(d)    Mr. Kenny notified of his termination decision very soon after Mr. Kalman took leave to treat his disability;

(e)    Mr. Kenny notified of his termination decision almost immediately after he knew that Mr. Kalman would require additional disability accommodation in the form of a part-time work schedule;

(f)    Mr. Kenny gave shifting reasons for his termination decision in his termination phone call, with the job elimination basis being clearly false with the hire of Mr. Kalman's replacement; and

(g)    "Key Auto Group" Human Resources, which was in a position to know of disability-related job protections for Mr. Kalman, was not consulted with regard to Mr. Kalman's termination and its employee, Mr. Felber, communicated displeasure with the termination decision.

122.    Defendants, Mr. DiLorenzo, d/b/a as "Key Auto Group," Key Auto, LLC, DiLorenzo Holding, and the dealerships within the "Key Auto Group" Western New Hampshire/Vermont Region, to wit, KFML, KMR, WRC, KML and KMSB, are all liable for Mr. Kalman's discriminatory termination as either "integrated" or "joint" employers of Mr. Kalman.

16

123.    The factors considered in determining whether two or more entities are a single employer under the integrated-enterprise test are: (1) common management; (2) interrelation between operations; (3) centralized control over labor relations; and (4) common ownership.  Torres-Negron v. Merck & Co., Inc., 488 F.3d 34, 42 (1st Cir. 2007).

124.    An entity may be considered a "joint employer" if it possesses sufficient control over the work of an employee of another company.  See Ahanotu, 466 F. Supp. at 392.

125.    Factors to be considered in analyzing "joint employment" are "(1) [Whether] there is an arrangement between employers to share an employee's services or to interchange employees;

(2) [Whether] one employer acts directly or indirectly in the interest of the other employer in relation to the employee; or, (3) [Whether] the employers are not completely disassociated with respect to the employee's employment and may be deemed to share control of the employee, directly or indirectly, because one employer controls, is controlled by, or is under common control with the other employer."  See 29 C.F.R § 825.106.

126.    Most, if not all, of the "integrated employer" and "joint employer" factors are satisfied in this case where:

(a)      Mr. DiLorenzo, as "Key Auto Group," commonly owned and managed Key Auto, LLC, DiLorenzo Holding, and all 20 of the "Key Auto Group" dealerships, including the Western New Hampshire/Vermont dealerships;

(b)      Mr. Kenny commonly managed the 5 Western New Hampshire/Vermont dealerships;

(c)      Mr. Ambrose commonly managed 2 dealerships, KFML and KML;

(d)      "Key Auto Group" Human Resources and its Director, Ms. O'Brien, oversaw labor relations at all 20 of the "Key Auto Group" dealerships;

(e)      All 20 of the dealerships and all "Key Auto Group" employees were subject to common "Key Auto Group" policies, governing operations and terms and conditions of employment;

(f)      "Key Auto Group" dealerships employed managers to supervise employees and operations in *other* "Key Auto Group" dealerships;[1] and

(g)      "Key Auto Group" dealerships employed managers who were authorized to hire and fire employees in *other* "Key Auto Group" dealerships;[2]

127.    Defendant, Cicotte is liable as successor to KFML where: 1) it is a bona fide successor as it has continued KFML's operations; 2) it had notice of Mr. Kalman's claims against KFML via due diligence prior to its asset purchase; and 3) to date, none of the "Key Auto Group" defendants have shown that they are capable of providing relief to Mr. Kalman.  See Kratz, 375 F. Supp. at 150 (reciting the federal common law for analyzing successor liability for civil rights claims).

128.    Mr. Kalman has suffered economic and emotional losses as a result of the discriminatory termination attributable to all of the Defendants.

### COUNT II – Violation of ADAAA 42 U.S.C. § 12203 (a) and RSA 354-A:19 Retaliatory Discharge for Availing of Reasonable Accommodation and Requesting Reasonable Accommodation *(against all Defendants)*

129.    The above and below paragraphs are incorporated by reference as if set forth fully herein.

130.    In addition to being discriminatorily fired for having a disability, Mr. Kalman was unlawfully terminated in retaliation for engaging in the protected activities of:

(a)      *availing of his right to reasonable accommodation* to his disability, by taking leave from work to seek in-patient treatment from August 19, 2020 to September 10, 2020; and

(b)      *requesting additional reasonable accommodation* to his disability, by asking for a part-time work schedule upon his return to work.

---

[1] For example, Mr. Kenny, as "Key Auto Group" Regional VP, General Manager of KMR, and General Manager of KMSB, supervised not only KMR and KMSB employees but also KFML, WRC, and KML employees.  Similarly, Mr. Ambrose, General Manager of KFML, supervised both KFML and KML employees.
[2] Mr. Kenny, of "Key Auto Group," KMR, and KMSB, was authorized to fire KFML employee, Mr. Kalman, and to hire his replacement.

131.     Mr. Kalman had protected rights to reasonable accommodation under 42 U.S.C. § 12112 (b)(5) and RSA 354-A:7, VII, where both require employers to make "reasonable accommodations to the known physical … limitations of an otherwise qualified individual with a disability who is an … employee."

132.     Mr. Kalman also had a protected right to merely *request* accommodation to his disability.  See Soileau v. Guilford of Maine, Inc., 105 F.3d 12, 16 (1st Cir. 1997)(holding that Congress intended with the ADA to protect employees from retaliation for requesting accommodation).

133.     Notably, the Soileau court construed protection for accommodation requesters to dissuade employers from granting requests only to immediately terminate the requesters.  What Soileau sought to discourage is precisely what happened to Mr. Kalman, who was terminated on the last day of his rehabilitation leave and immediately after he asked to return to work.

134.     Mr. Kalman does not have to prove he was disabled within the meaning of the ADAAA, or regarded as disabled under the ADAAA, to sustain a claim that he was retaliated against for requesting the accommodation of the part-time work schedule.  See Colon-Fontanez v. Municipality of San Juan, 660 F.3d 17, 36 (1st Cir. 2011)("Case law recognizes that an ADA plaintiff need not succeed on a disability discrimination claim in order to assert a claim for retaliation.").

135.     To state a claim for retaliation under the ADAAA and RSA 354-A, Mr. Kalman need only allege that: (1) he engaged in protected conduct; (2) suffered an adverse employment action; and (3) there was a causal connection between the protected conduct and the adverse action.  Colon-Fontanez, 660 F.3d at 36.

136.      Mr. Kalman sufficiently "requested" both the accommodation of leave time for his hospitalization and the accommodation of a part-time work schedule where he placed his direct supervisor, Mr. Ambrose, on notice of his disability and of his need for accommodation.  See Freadman v. Metro. Prop. & Cas. Ins. Co., 484 F.3d 91, 103 (1st Cir. 2007)(holding that to establish a

"request for accommodation," the employee need only show that, based on his communications to the defendant, "defendant knew or reasonably should have known that the employee's request was [for a purported] disability.").

137.    Mr. Ambrose and Mr. Kenny knew or reasonably should have known that Mr. Kalman required disability accommodation where:

(a)    Mr. Kalman was visibly ill, malnourished, and incapacitated at work for months before he requested leave for inpatient treatment, and part-time work after treatment;

(b)    Mr. Kalman kept Mr. Ambrose apprised of his testing, treatment, and diagnoses throughout that six-month period; and

(c)    Mr. Ambrose and Mr. Kenny were at least aware of Mr. Kalman's series of testing, his ongoing "medical issues," and, ultimately, his admission to Dartmouth Hitchcock Medical Center for several days to treat his "medical issues," as these have all been admitted to Ms. O'Brien in verified response.

138.    There is a causal connection between the adverse action of Mr. Kalman's termination and Mr. Kalman's protected activity in taking leave and requesting a reduced schedule where:

(a)    Mr. Kalman maintained an unblemished work record prior to taking medical leave and requesting a part-time work schedule;

(b)    Mr. Kalman's supervisors made no mention to Mr. Kalman of performance deficiencies prior to his need to take medical leave and his request for a reduced work schedule; and

(c)    Mr. Kalman's termination occurred just three weeks after his leave for hospitalization, and within days of his request for a reduced work schedule.  See e.g. Wright v. CompUSA, Inc., 352 F.3d 472, 478 (1st Cir. 2003)(finding sufficient causation evidence where employee "was terminated immediately after returning from medical leave and requesting [additional] accommodation."

139.    Mr. Kalman suffered economic and emotional losses as a result his retaliatory termination, and all of the Defendants are liable for these losses, as  integrated, joint, or successor employers for the reasons stated supra.

**COUNT III – Violation of FMLA 29 U.S.C. § 12615 (a)**
**Interference with Plaintiff's FMLA Rights**
***(against all Defendants)***

140.    The above and below paragraphs are incorporated by reference as if set forth fully herein.

141.    Mr. Kalman asserts three FMLA interference theories.  First, he alleges that the Defendants failed to follow notice and leave designation requirements under FMLA regulations, resulting in interference with his right to *know* he was entitled to protected medical leave, and ultimately his termination, for lack of his ability to *assert* his legal protections.  See e.g. Bellone v. Southwick-Tolland Reg'l Sch. Dist., 748 F.3d 418, 423 (1st Cir. 2014)(discussing 29 C.F.R. § 825.300 (e) providing, "that an employer's failure to follow the FMLA notice requirements may constitute an interference with, restraint, or denial of the exercise of an employee's FMLA rights" and that, if harmed, the employee has a cause of action under 29 U.S.C. § 2615 (a)).

142.    Second, Mr. Kalman alleges that the Defendants interfered with his substantive right to take protected medical leave, where it ended his employment during his protected leave period.

143.    Third, Mr. Kalman alleges that Defendants interfered with his FMLA right to reinstatement to his sales manager position, by firing him days before his anticipated return to work.

144.    Mr. Kalman may bring these FMLA interference claims co-extensive with his FMLA retaliation claims, because he was denied reinstatement after taking his medical leave and "the only reason cited for [his] termination predates [his] return to work" date.  See Lance Cote v. Concord Hospital, Inc., No. 17-CV-421-PB (D.N.H. Feb 23, 2018) at Exh.  See also Colburn v. Parker Hannifin/Nichols Portland Div., 429 F.3d 325, 332 (1st Cir. 2005)(analyzing an interference claim based on failure to reinstate an employee after leave).  See also Campbell v. Gambro Healthcare, Inc.,

21

478 F.3d 1282, 1288 (10th Cir. 2007)(allowing an interference claim and a retaliation claim when "the employer cites only factors predating the employee's return to work to justify the adverse action" in order to avoid "a perverse incentive for employers to make the decision to terminate during an employee's FMLA leave, but allow the employee to return for a brief period before terminating her so as to insulate …. from an interference claim.")

145.    The prima facie elements of an FMLA interference claim are: (1) the employee was eligible for the FMLA's protections; (2) the employer was covered by the FMLA; (3) the employee was entitled to leave under the FMLA; (4) the employee gave the employer notice of his intention to take leave; and (5) the employer denied the employee FMLA benefits to which he was entitled. Brown v. HCA Health Servs. of New Hampshire, Inc., No. 15-CV-323-AJ, 2016 WL 141672, at *2 (D.N.H. Jan. 12, 2016).

146    Mr. Kalman was eligible for FMLA protections where he worked for the Defendants at the KFML location for 12 months preceding his August 20, 2020 notice to Mr. Ambrose that he needed to medical leave to treat his serious health condition.

147.    Where Mr. Kalman worked at his KFML worksite, 75 miles from the Western New Hampshire/Vermont Key Auto Group dealerships, as well as 75 miles from the Rochester and Somersworth Key Auto dealerships,  he satisfied FMLA's requirement that he be stationed to work within 75 miles of 50 or more of Defendants' employees work locations.

148.    As discussed supra, Mr. Kalman was employed by Mr. DiLorenzo, "Key Auto Group," Key Auto, LLC, DiLorenzo Holding, and the Western New Hampshire/Vermont dealerships supervised by Mr. Kenny and Mr. Ambrose as either "joint" or "integrated" employers, making these Defendants' employees his co-workers for the purpose of the FMLA.

149.    These employers were additionally "covered" by the FMLA where they collectively employed more than 50 employees.

150.    The Key Auto Group Employee Handbook acknowledges that "Key Auto Group" employees have FMLA rights.  Exhibit 2.

151.    Mr. Kalman was entitled to FMLA leave as he had not exhausted any of his 12-week leave entitlement before giving notice to Mr. Ambrose, that he urgently needed leave to treat his neuropathy and paralysis.

152.    Mr. Kalman adequately "provided notice of his intent to take leave," as all that is required under FMLA regulation is "verbal notice sufficient to make the employer aware that the employee needs FMLA-qualifying leave, and the anticipated timing and duration of the leave."  29 C.F.R. 825.302 (c).  Mr. Kalman kept Mr. Ambrose apprised, throughout his hospitalization and rehabilitation, of his health status and his anticipated discharge date.

153.    The Defendants denied Mr. Kalman FMLA benefits to which he was entitled where:

    (a)    they failed to provide Mr. Kalman either the FMLA Eligibility Notice, the FMLA Rights and Responsibilities Notice; or the FMLA Leave Designation Notice, that employers must provide employees under 29 C.F.R § 825.300, to educate as to FMLA rights and responsibilities and to facilitate leave-taking;

    (b)    they refused Mr. Kalman his full leave entitlement, choosing instead to fire him during his period of entitlement;

    (c)    they refused to reinstate Mr. Kalman after he notified that he would no longer need leave as of September 14, 2020, electing instead to terminate him on September 10th, before he could accomplish reinstatement.

154.    Mr. Kalman suffered economic and emotional losses due to interference with his FMLA benefits, and all of the Defendants are liable for these losses, as integrated, joint, or successor employers for the reasons stated supra.

### COUNT IV – Violation of FMLA 29 U.S.C. § 12615 (b)
### Retaliatory Discharge for Taking and Requesting FMLA Protected Leave
### (*against all Defendants*)

155.   The above and below paragraphs are incorporated by reference as if set forth fully herein.

156.   To make a prima facie case for FMLA retaliation, an employee must show: (1) he availed of a protected FMLA right; (2) he was "adversely affected by an employment decision;" and (3) "there was a causal connection between [his] protected conduct and the adverse employment action." Carrero-Ojeda v. Autoridad de Energia Electrica, 755 F.3d 711, 719 (1st Cir. 2014).

157.   As discussed supra, Mr. Kalman was eligible and entitled to FMLA leave beginning August 19, 2020 and he, unwittingly, availed of this right until September 10, 2020, when he was terminated by Mr. Kenny.

158.   Mr. Kalman additionally, albeit again unwittingly, availed of his right to *request* FMLA leave, where he asked Mr. Ambrose for a reduced, part-time schedule, upon his return to work. See e.g. Colburn, 429 F.3d at FN 10 (including "requesting" FMLA accommodation in the prima facie elements for FMLA retaliation).

159.   There was a causal connection between Mr. Kalman's termination and his leave taking and request for additional leave where:

(a)   Mr. Kalman maintained an unblemished work record prior to his taking leave and requesting the part-time schedule;

(b)   Mr. Kalman's supervisors made no mention to Mr. Kalman of performance deficiencies prior to his need to take medical leave and request for a reduced work schedule; and

(c)   Mr. Kalman's termination occurred just three weeks after his leave for hospitalization, and within days of his request for a reduced work schedule. See e.g. Wright v. CompUSA, Inc., 352 F.3d 472, 478 (1st Cir. 2003)(finding sufficient causation evidence where employee "was terminated immediately after returning from medical leave and requesting [additional] accommodation."

160.   Mr. Kalman suffered economic and emotional losses due to retaliation against his leave taking and requesting additional leave time, and all of the Defendants are liable for these losses, as integrated, joint, or successor employers for the reasons stated supra.

WHEREFORE, the Plaintiff, Nicholas Kalman, respectfully prays that this Honorable Court:

A.   Schedule this matter for trial by jury, and after trial;

B.   Award the Plaintiff damages for economic losses, including without limitation lost wages (back, front, and future pay), lost employment benefits, and lost earning capacity;

C.   Award the Plaintiff compensatory damages, including without limitation emotional distress, humiliation, inconvenience and loss of enjoyment of life;

D.   Award enhanced compensatory damages;

E.   Award the Plaintiff punitive damages;

F.   Award the Plaintiff liquidated damages;

G.   Award the Plaintiff his reasonable attorney's fees;

H.   Award the Plaintiff interest and costs;

I.   Award all other damages available to the Plaintiff at law, and

J.   Award the Plaintiff such other relief as this court deems equitable and just.

Respectfully submitted,

NICHOLAS KALMAN,

By his attorneys,

DOUGLAS, LEONARD & GARVEY, P.C.

Date:  August 18, 2020          By:   /s/ Megan Douglass
                                      Megan Douglass #19501
                                      14 South Street, Suite 5
                                      Concord, NH 03301
                                      (603) 224-1988
                                      mdouglass@nhlawoffice.com